ALDEN W. SHERMAN & another, executors, *vs.* BRIGGS REALTY COMPANY.

Middlesex.     October 7, 1941. — December 29, 1941.

Present: FIELD, C.J., DONAHUE, QUA, COX, & RONAN, JJ.

*Broker,* Commission.

Findings that the efforts of an authorized broker were the efficient cause of a sale of real estate and that the broker had earned a commission were warranted by evidence that the broker on two occasions showed the property to a prospective customer, who shortly after the second occasion informed the broker that the property was not "suitable" but who some six months later, without further activity on the part of the broker, made a contract of sale with the owner at the price originally specified by the owner to the broker.

Bad faith of a landowner toward a real estate broker and an intent to avoid paying him a commission could have been found on evidence that, after the broker's efforts had brought about an oral agreement of sale unknown to the broker, the owner, who knew of the broker's activities and had promised to "protect" him "in a commission,"

wrote the broker, before the date of a written contract of sale, falsely stating in effect that the broker had not achieved "any apparent results," that the broker's customer had become interested in the property through others before the broker "contacted" him and probably would "contact" the owner "direct" if "ever" "seriously interested," and that the owner would "go along" that year "without any advertisements."

CONTRACT. Writ in the Superior Court dated May 12, 1938.

The action was tried before *Pinanski*, J.

*A. P. Stone*, for the defendant.

*J. N. Esdaile*, for the plaintiffs.

Cox, J. This is an action of contract to recover a broker's commission alleged to have been earned by the plaintiffs' testate in the sale of real estate owned by the defendant. There was a verdict for the plaintiffs. The defendant's exceptions are to the denial of its motion for a directed verdict, and also to the denial of certain requested rulings of law.

The plaintiffs' testate, Herbert C. Moseley, who died on October 13, 1937, was a real estate broker, and the defendant, a corporation, was the owner of the premises, hereinafter referred to as the Apex Building, for the sale of which to the United–Carr Fastener Corporation, hereinafter referred to as Carr Fastener Company, the commission is claimed. One Daggett was the president and general manager of the defendant, and also of another company, which, it could have been found, had "practical" control of the defendant. No question is raised as to the authority of Daggett to act for the defendant, and it concedes that if Moseley was the operating, predominating and efficient cause of the oral sales agreement that was made in December, 1936, he was entitled to his commission.

The jury could have found that Moseley was authorized to sell the Apex Building for $150,000, and that, in the event of a sale, his commission was to be five per cent. Prior to this authorization, he had been authorized to lease the building in question, and to place his sign upon it as he did. On February 11, 1935, he showed the building to one Kimbell, the general manager of the purchaser. Immediately

after the inspection, Moseley saw and told Daggett that he had shown the building to a representative of the Carr Fastener Company, that he had had other conferences with him, and that he wished to be protected in a commission in case that company should purchase the property. Daggett inquired as to the amount of the commission and was told by Moseley that he would charge five per cent. Daggett told Moseley that he "would protect him in a commission," and that he was going to turn the matter of showing the building over to "his man" Whittaker. He then called Whittaker to his office and introduced him to Moseley and Moseley's son, who was also present. At that time Daggett asked Moseley to send him a letter to the effect that he would charge only five per cent commission instead of six, and by letter dated February 27, 1935, Moseley complied. In an entry in Moseley's diary, under date of June 11, 1936, it was stated that he had talked with Daggett about the sale of the Apex Building for $150,000 to the Carr Fastener Company. There was evidence that at this conversation Moseley told Daggett that he would keep working on the matter. On June 15, 1936, Moseley wrote Daggett that he had an appointment to show the Apex Building again to the Carr Fastener Company and asked, in effect, that the building be placed in condition so that it might be shown as advantageously as possible.

On June 19, 1936, Moseley, one of his associates and Whittaker went to the building with Kimbell and inspected the premises. Kimbell was told that it would be all right for him or any of his associates to contact Whittaker "direct" and go into the building before making any decision. Thereafter, Moseley wrote a letter in regard to the lease or sale of the building, and Kimbell replied on July 14, 1936, that he and his associates were of the opinion that the building was "not suitable for . . . [their] requirements." Shortly before Christmas, 1936, Moseley was informed that the Carr Fastener Company was asking for bids to remodel the Apex Building, whereupon he wrote a letter to Daggett on December 22, 1936, in which he said, among other things, "We are going to keep in close touch with this cor-

poration [Carr Fastener] with the hope of making this sale." He next obtained an appointment with Kimbell and saw him on December 28, 1936. After some delay, Kimbell came in, apologized for keeping Moseley and his associate waiting, and said that he had just put through a call to Whittaker to see just where they stood "in this matter." He said he was interested in the Apex Building again. Moseley told him that he and his associate were interested as brokers, "having shown him the building," and Kimbell replied, "I suppose I should have called you up but this came up suddenly and I saw Daggett and Whittaker and talked with them."

Some time in December, 1936, Kimbell agreed to buy the building for $150,000. The written agreement of sale was dated January 25, 1937, under the provisions of which the purchaser immediately began to move into the building. Final papers were passed on July 7, 1937. On January 4, 1937, Daggett wrote the following letter to Moseley: "I am returning the statement of the United–Carr Fastener Corporation, as we had a recent one on hand. United–Carr Fastener has been interested in this building for several years. They have been shown the plant several times before you contacted them — not only by us but by other brokers. The chances are that, if they ever become seriously interested, they will contact me direct, as they purchased one building from me several years ago. You have had your signs operating for several years without any apparent results. I think we will go along this year without any advertisements, thus giving all brokers an equal opportunity to make the sale." Kimbell testified that in December, 1936, his company needed space "in a hurry" so "they went over to Daggett and made a deal to buy the building. They didn't even dicker with him." He had hoped to get a "better price," but did not succeed.

There was no evidence that between June 19, 1936, when Moseley showed the building to Kimbell, and December 22, 1936, when he wrote to Daggett, he did anything with reference to the sale of the building beyond what has been recited.

The first count of the plaintiffs' declaration, in substance, alleges that Moseley was employed by the defendant to negotiate a sale of the real estate in question and that Daggett had agreed to pay him a commission of five per cent if he obtained a purchaser at the price of $150,000, and that he did procure such a purchaser. The second count is upon an account annexed, alleging that there is a commission due for the sale of the Apex Building. In order to recover, the plaintiffs had the burden of showing that Moseley produced a customer who was able, ready and willing to purchase on the defendant's terms. *Maher* v. *Haycock*, 301 Mass. 594, 595, and cases cited. See *Simon* v. *Lettiere*, 257 Mass. 563, 570; *Pacheco* v. *Medeiros*, 292 Mass. 416, 420–423. It must be shown that his efforts were the efficient cause of the accomplishment of that which the offer required as the basis of a commission and not merely a contributing cause. *John T. Burns & Sons, Inc.* v. *Hands*, 283 Mass. 420, 422, 423. As was said in *Holton* v. *Shepard*, 291 Mass. 513, at page 516: "The broker may make out his case if he produces the customer to whom the sale is made without termination of his employment . . . and no new forces enter into the transaction which break the causal relation between his efforts and the sale." Ordinarily the broker must show more than that he merely introduced the customer to the seller, or that he first interested the customer in the subject of the sale. The evidence must go far enough to justify findings that the broker's services were the efficient or effective means of bringing about the sale. *Kacavas* v. *Diamond*, 303 Mass. 88, 91, 92.

We are of opinion that the jury could have found that Moseley had earned his commission. It is true that he was informed by the Carr Fastener Company on July 14, 1936, that the officers of the Carr Fastener Company were of the opinion that the building was not suitable for their requirements, and that Moseley did nothing more by way of bringing about a sale to that corporation up to the time when the oral agreement for purchase was made in December, 1936. In June, 1936, Moseley had shown the building to Kimbell and had informed him that it was all right for him to con-

tact Whittaker "direct" and go into the building before making any decision. But it could have been found that the following December Kimbell agreed orally to purchase the building which, so far as appears, was in the same condition as it was when his letter was written. When this oral agreement was made, Daggett and Kimbell did not "even dicker." It is true that Kimbell testified that in December they needed space and needed it in a hurry, but the jury were not required to accept this explanation, and we think they could have found that Moseley's efforts in June, 1936, were the efficient cause of the sale and that "no new forces . . . [had entered] into the transaction which . . . [broke] the causal relation between his efforts and the sale." See *Holton* v. *Shepard*, 291 Mass. 513, 516; *Kacavas* v. *Diamond*, 303 Mass. 88, 91, 92. It could have been found that the customer had been accepted by the defendant on its terms, and proof of a binding agreement between them was not necessary. *Lieberman* v. *Cohn*, 288 Mass. 327, 330. It could not have been ruled, as matter of law, that Moseley was not the predominating and efficient cause of the sale, or that the plaintiffs were not entitled to recover. The case at bar is distinguishable from *Smith* v. *Kimball*, 193 Mass. 582, *Brooks* v. *Gregory*, 285 Mass. 197, and *Cramer* v. *Wood*, 302 Mass. 161.

The defendant requested the trial judge to rule that "2. There is no sufficient evidence to show that the defendant sold the property or delayed in selling it for the purpose of avoiding a commission to the plaintiffs' intestate. [*sic.*] 3. There is no sufficient evidence of any bad faith on the part of the defendant in the transaction." Daggett knew that Moseley had shown the building to Kimbell in February, 1935, and was told that Moseley wished to be protected "in a commission" in case the Carr Fastener Company should purchase the property. Daggett told Moseley that he would protect him. Daggett was informed by Moseley in June, 1936, of his appointment to show the building "again" to the Carr Fastener Company. He did show it on June 19, 1936. When Daggett wrote to Moseley on January 4, 1937, as hereinbefore related, it could have been

found that he knew that the sale had been orally agreed upon and that the terms of the sale were those that had been given to Moseley. Before Daggett was shown this letter, he had testified that he wrote it in 1936. In view of the fact that Daggett had promised to protect Moseley as to his commission, we think the jury could have found that the defendant had a purpose to avoid paying a commission to Moseley, and that there was evidence of bad faith. It is to be observed that the letter stated, among other things, that Daggett was returning the statement of the Carr Fastener Company. In a memorandum of Moseley's it was stated that on June 11, 1936, he had shown Daggett a financial statement of the Carr Fastener Company, and in his letter to Daggett on December 22, 1936, he stated that he was enclosing their financial statement. Daggett stated in his letter that the building had been shown the Carr Fastener Company by other brokers, although he testified that, so far as he knew, Moseley was the only broker who showed the property to Kimbell. The import of the letter in the circumstances is significant. The question of bad faith in cases of this character ordinarily arises where the owner revokes the broker's authority, or makes the sale through other means when the broker has performed all he has undertaken or is plainly or evidently approaching success in his undertaking, see *Kacavas* v. *Diamond*, 303 Mass. 88, 92, 93, "or where a sale is made behind the back of a broker." *Holton* v. *Shepard*, 291 Mass. 513, 522. Here it is to be borne in mind that Daggett had promised to protect Moseley "in a commission," that the Carr Fastener Company was what might properly be called Moseley's customer, and that the jury could have found that there was no break in the causal relation. We are of opinion that there was no error in the denial of these requests.

*Exceptions overruled.*