Stephen H. **KARELITZ**, Plaintiff,

v.

**DAMSON OIL CORPORATION**, Defendant.

Civ. A. No. 82–1782–T–A.

United States District Court, D. Massachusetts.

July 11, 1986.

---

Malcolm D. Finks, Arnold E. Cohen, Englander, Englander & Finks, James F. Meehan, Meehan, Boyle & Cohen, Boston, Mass., for plaintiff.

David C. Lucal, James S. Dittmar, Widdett, Slater, & Goldman, Boston, Mass., for defendant.

## OPINION

BAILEY ALDRICH, Senior Circuit Judge [*].

In this action of contract, in which the jury found for plaintiff Karelitz, defendant, Damson Oil Company, moves for judgment n.o.v. The contract, memorialized in a document drafted by plaintiff, reads as follows.

This is to confirm that Stephen H. Karelitz introduced us to *Juniper Oil Corp.* and that in the event we conclude with *Buttes Oil* either by reorganization, acquisition, consolidation, merger or like transaction, Stephen H. Karelitz will be entitled to a 3% fee. We agree that said fee will be paid in stock ["cash" crossed out; "stock" handwritten above it] when said transaction is closed.

This common form of agreement, though sometimes known as a finder's contract, places upon the contractor or broker something more than an obligation to find in the sense of discover. In order to earn the fee he must be the, or at least a, procuring cause of the ultimate transaction; to have

[*] Sitting by designation.

participated in creating the interest of the other party as well as the interest of his customer. The court charged the jury,

The mere fact that the plaintiff introduced defendant, and may have raised a possibility of a transaction, does not, in itself, entitle him to recover.... [T]he acquisition must directly result from plaintiff's introduction.... You are familiar with the word "cause." For cause to be meaningful ... there must be ... a continuing connection between what he did and the ultimate result.

Plaintiff did not object, and in his present brief states the instructions were proper, as, in fact, they were. A "causal connection between his efforts and the sale," *Holton v. Shepard,* 291 Mass. 513, 516, 197 N.E. 460, 462 (1935) means a connection at both ends resulting from the finder's efforts. *See, e.g., Seckendorff v. Halsey, Stuart & Co.,* 259 N.Y. 353, 182 N.E. 14 (1932). In a case cited by both parties, *Schaller v. Litton Industries, Inc.,* 307 F.Supp. 126 (D.Wis.1969), the court said, at p. 132,

"Schaller was supposed to interest Litton in Louis Allis, *and Louis Allis in Litton,* and place them in contact with each other. Having done so, he was entitled to his fee, *if as a result of such interest,* Litton acquired Louis Allis." (Emphasis supplied.)

Plaintiff offers no authority relieving him of the obligation of showing that he contributed to Boreta's decision. In *Simon v. Electrospace Corp.,* 28 N.Y.2d 136, 320 N.Y.S.2d 225, 269 N.E.2d 21 (1971), the agreement read, "In the event a sale of stock, or all the assets, or a merger is *arranged by you with a corporation,* company, or individuals introduced by you ... a fee will be paid...." (Emphasis supplied). Plaintiff concedes, "This agreement is very similar to the one between D.O.C. (Damson) and Karelitz." If there were substituted for the words "arranged by you with a corporation," the phrase "with a corporation interested by you" it would be

exactly this case. As, again, the court said in *Simon*, 28 N.Y.2d at 142, 320 N.Y.S.2d at 299, 269 N.E.2d at 24, there must be "a continuing connection between the initial efforts and the merger that came about." In other words, plaintiff's burden was to show that whatever interest he initially evoked in Boreta in April 1973, still remained, at least to some extent, in 1981.

Admittedly Boreta's initial interest was in no way nurtured by plaintiff following that April. Even on plaintiff's evidence, Boreta showed no interest after July, 1973 until 1977, when Damson, through one Carnesale, and without even informing plaintiff, arranged a meeting, which bore no fruit. Carnesale was plaintiff's witness. He testified that Damson had offered him a three percent commission. (One must wonder if defendant was expected to pay two commissions.)

The events subsequent to this came from defendant's witnesses. Boreta testified that he became actively interested in selling in late 1979. He compiled a list of twenty possibilities, none of which was Damson, and circulated eight of them. Damson learned of this, and asked for information, but, on receiving it, did not respond. Boreta, who had an auction in mind, decided not to proceed with it.

In 1981 one Blancett, apparently one of the previous eight, suggested that Boreta permit him to send Damson the full package he, Blancett, had originally received. Boreta demurred at first, but then acceded. A sale to Damson eventuated. After the sale was announced Damson telephoned plaintiff and asked why he had not congratulated him. Plaintiff said he was owed a commission. Damson refused, and this suit followed.

If Boreta is credited, plaintiff was well out of the picture. Concededly, the general rule is that on motions for directed verdict the defendant's evidence is to be disregarded. On rare occasions, however, the court has departed somewhat from this strictness. *Dehydrating Process Co. v. A.O. Smith Corp.*, 292 F.2d 653, 656 n. 6 (1st Cir.1961); *Grayson v. Pride Golf Tee Co.*,

433 F.2d 572, 575–76 (1st Cir.1970). This might be an appropriate case. Boreta and Blancett were uncontradicted, and entirely plausible. More to the point, Boreta, the vital party, was the one whose state of mind was crucial. For not calling him, it having been shown that Boreta was available, an unfavorable inference might be drawn against plaintiff. It might be proper to look to his testimony.

Even if this not be done, an eight-year lapse is markedly different from the eighteen months' possible survival the court accepted in *Simon*. If a jury is free to find, in the absence of evidence of any kind, that a finder's contract remains alive, so that the customer cannot safely deal with the third party after eight years, such a ruling would make bad business sense as well as bad common sense. It is significant that plaintiff has produced no authority even suggesting such an interval. It is too much.

Nor is plaintiff's case advanced by testimony that at the April 1973 meeting Damson told him that his, plaintiff's, job was completed. True, it was completed, but liability still depended on the future; whether plaintiff's efforts "took." *Cf. Bloomberg v. Greylock Broadcasting Co.*, 342 Mass. 542, 545, 174 N.E.2d 438, 440 (1961) ("[T]hat is all you have to do.").

Nor is plaintiff saved by his testimony that, from time to time, Damson told him he would earn his fee if the sale went through later. This was, of course, an admission that defendant still retained an interest due to plaintiff's actions, an essential part of plaintiff's burden. It was not, however, an admission that Boreta retained an interest, the other essential part. If it were claimed to be a changing of the agreement, eliminating the need of plaintiff's effecting Boreta's interest, there was no consideration therefor. And, in fact, as has been pointed out, there is no claim that the contract was changed.

If it had subsequently affirmatively appeared, e.g., by testimony from him, that Boreta did retain an interest from plaintiff's 1973 introduction, defendant's admis-

134

sion would have completed plaintiff's case. But this brings us back to the beginning, the impropriety of permitting a finding, without more, that simply because a broker unsuccessfully sought to induce a sale in 1973 he is to be credited with a sale eight years later.

Finally, plaintiff claims an inference from Damson's telephone call after the event as an admission of liability. This is pure speculation. Plaintiff and defendant were friends, and it was only natural to call about old times. To meet a burden of proof, an inference must have more substance than this.

I make, however, two rulings. First, I order judgment for the defendant. If, however, the Court of Appeals should think there was a modicum of evidence sufficient to require submission to the jury, I would grant a new trial. Here, at least, I would be free to give some consideration to the record as a whole, and on that basis I am shocked by the verdict. Boreta's testimony was not only inherently credible; plaintiff had done next to nothing in the way of persuasion, or that could fairly last eight years. Simply by his own, unsupported, testimony, he has sought to make out a case, long after the event. I believe the verdict a gross miscarriage, very possibly because the jury applied its own, literal interpretation to the agreement, in disregard of the instructions.

As to jurisdiction, this is a close question, but I am content not to reverse the previous judge's ruling.